**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JAIME ROMERO BRIBIESCA,<br><br>            Plaintiff,<br><br>    v.<br><br>KILOLO KIJAKAZI, ACTING COMMISSIONER OF SOCIAL SECURITY,<br><br>            Defendant. | No. 1:22-cv-01216-SKO<br><br>**ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT**<br><br>(Doc. 1) |

## I.   INTRODUCTION

Plaintiff Jaime Romero Bribiesca ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). Doc. 1. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

## II.   BACKGROUND

Plaintiff was born on December 1, 2001, and he was 18 years old when he filed his claim for DIB on February 4, 2020. (Administrative Record ("AR") 21, 30.) In his application, he alleged a disability onset date of May 31, 2006, based on his borderline intellectual functioning and seizure disorder. (AR 21.) He has a high school education but no past relevant work. (AR 30.)

---

[1] The parties have consented to the jurisdiction of the U.S. Magistrate Judge. (*See* Doc. 11.)

### A. Relevant Evidence of Record[2]

#### 1. Medical Evidence

Plaintiff has a history of below-average intellectual functioning. Beginning in 2009, when Plaintiff was in third grade, various testing indicated he suffered from "a severe receptive and expressive language disorder," which qualified him for special education services. (AR 543.) A multi-disciplinary report from the Sanger Unified School District in December 2009 found Plaintiff had a Full-Scale IQ score of 62, which placed him in the 1st percentile. (AR 565.) To accommodate the Plaintiff's abilities, school officials provided him individual education programs ("IEPs") with various classroom accommodations.

Other testing from Plaintiff's childhood revealed the same. In November 2012, Dr. Mark Barnes assessed Plaintiff's intellectual and adaptive functioning and assigned Plaintiff a Full-Scale I.Q. of 57,[3] which Dr. Barnes noted as "moderately impaired."[4] (AR 768, 772.) Dr. Barnes ultimately diagnosed Plaintiff with mild mental retardation. (AR 772.) In a 2013 psychological evaluation, Dr. Richard Engeln found Plaintiff's communication skills were in the "mild range of mental retardation," and his daily living skills were "below average." (AR 583.) Dr. Engeln diagnosed Plaintiff with moderate to severe academic delay and found regular ed class placement with "significant special ed support around academic levels" would be appropriate. (AR 583.)

The next set of records date from 2018 – 2021 and reflect some progress in Plaintiff's abilities, though he continued to regularly score below average on the tests administered. An October 2018 psychological evaluation report suggested Plaintiff's academic achievement was very low to below average. (AR 559.) He received various IEPs at school, which provided Plaintiff accommodations like modified grading policies, extra time to complete assignments and access to a separate study area. (AR 510.) He placed outside of regular ed class or other activities

---

[2] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.
[3] Dr. Barnes performed the testing in accordance with the Wechsler Adult Intelligence Scale, Fourth Edition. (AR 768.)
[4] Under the Comprehensive Test of Nonverbal Intelligence (CTONI), Plaintiff achieved a nonverbal IQ score of 68. (AR 769, 770.) Under the Adaptive Behavior Assessment System, Second Edition (ABAS-II), Plaintiff received a global adaptive composite score of 40, which amounted to severe impairment. (AR 770.)

27 percent of the time.  (AR 519.)  Since graduating from high school, Plaintiff has participated in the Sanger Adult Transition Program at Fresno State.  (AR 410.)  Plaintiff has not been formally diagnosed with an intellectual or learning disability, though his family has unsuccessfully pursued testing.  (AR 727.)  Plaintiff has never been formally tested for intellectual or learning disabilities, despite expressing interest in doing so and reporting symptoms consistent with an intellectual disability.  (AR 726, 733.)

Plaintiff currently lives at home with his family.  (AR 51.)  He often needs reminders from his mother to complete hygienic tasks like showering and brushing his teeth, though he can do so independently.  (AR 754.)  Plaintiff does some household chores, like laundry and the dishes, and he cleans his room.  (AR 50.)  He can do minimal food preparation, like preparing a cereal bowl or a peanut butter and jelly sandwich.  (AR 49.)   On occasion, he will heat food his mother leaves in the microwave.   (AR 51.)  Plaintiff's weak gross motor skills complicate some activities, including eating with utensils (AR 754) and dressing himself (AR 749, 762).  Plaintiff is never left alone because it is unclear how he would handle an emergency.  (AR 51.)  However, he can take the bus to his transitional education program at Fresno State University.  (AR 48.)  He enjoys playing video games and reads books at a first-grade level.  (AR 46, 55.)  While he suffered seizures in 2010 and 2011, he has no other major health issues.

### 2. Opinion Evidence

Steven C. Swanson, Ph.D., performed a psychological consultative examination on July 21, 2020.  (AR 675-680.)  He found Plaintiff had a Full-Scale I.Q. of 75,[5] placing him at the 5th percentile.  Based on those results, Dr. Swanson diagnosed Plaintiff with Borderline Intellectual Functioning (BIF).  (AR 678-679.)  BIF is not a "specific diagnosis" but rather "a descriptive term used to identify individuals with cognitive abilities falling within this particular range."[6]  Dr. Swanson indicated "[Plaintiff] can be expected to perform academically at a level that is considerably lower than same-aged peers."  (AR 678.)  Dr. Swanson concluded the following:

---

[5] Wechsler Adult Intelligence Scale, Fourth Edition.
[6] Understanding Borderline Intellectual Functioning: Definition, Causes, and Support, Sein Center (June 7, 2023), https://serincenter.com/treatments/borderline-intellectual-functioning/.

> Plaintiff is judged able to maintain concentration and relate appropriately to others in a job setting. He would be able to handle funds in his own best interests. He is expected to understand, carry out, and remember simple instructions. He is judged able to respond appropriately to usual work situations, such as attendance, safety and the like. Changes in routine would not be very problematic for him. There do not appear to be substantial restrictions in daily activities. Difficulties in maintaining social relationships do not appear to be present.

(AR 679.) Keylla Gomez, MA CCC-SLP, performed a consultative speech and language evaluation on July 21, 2020.[7] (AR 683-686.) Overall, Gomez found that Plaintiff "presents with language and articulation skills in the far below the average range for his age." (AR 686.[8])

On July 30, 2020, state agency psychological consultant Anna M. Franco, Psy. D., assessed Plaintiff's claim at the initial level. (AR 83-96.) Dr. Franco opined that Plaintiff was moderately limited in his ability to understand and remember detailed instructions (AR 94), and he had sustained concentration and persistence limitations. (AR 94.) She also found he was moderately limited in his ability to maintain attention and concentration for extended periods of time. (AR 94.) Ultimately, she found he retained capacity for simple and routine 1-2 step tasks; that he could interact and take instruction; that he was qualified for simple, unskilled work. (AR 95.) Regarding Plaintiff's seizure disorder, L. Bobba, M.D., reviewed the record and found Plaintiff's history of seizures was non-severe, as Plaintiff last seizure took place in 2011, and he was not taking any medication for the condition. (AR 91.) Upon reconsideration, Howard Leizer, Ph.D., agreed with Dr. Franco's assessments that Plaintiff has the capacity for simple, unskilled work comprised of 1-2 step routines. (AR 111.) Another state agency physician, J. Hartmann, M.D., agreed with Dr. Bobba's conclusion that Plaintiff's seizure amounted to a non-severe impairment. (AR 105.)

Luke Michels, M.D., first evaluated Plaintiff in May 2021 in response to Plaintiff's concerns he may have a learning disability. (AR 729.) He noted that Plaintiff reported symptoms consistent with an intellectual disability, though Plaintiff has never been formally tested for an intellectual or learning disability. (AR 733.) Dr. Michels suggested Plaintiff and his family pursue

---

[7] She conducted the Oral and Written Language Scales assessments, Second Edition (OWLS-II). (AR 685.)
[8] Plaintiff scored a 65 on the Listening Comprehension Scale, which put him in the 1st percentile. (AR 685.) Plaintiff's oral expression was average at the 21st percentile, and his oral language composition was below average at the 5th percentile. (AR 685.)

the testing to "help define the diagnosis." (AR 733). In a follow-up appointment, Dr. Michels noted the family had struggled to schedule the testing through a community program that provides low-cost psychological evaluations. (AR 727, Doc. 19 at 21.) Dr. Michels submitted a letter to the ALJ stating Plaintiff had a "working diagnosis" of intellectual disability, and Plaintiff was in the process of having neuropsychological testing completed to confirm the diagnosis. (AR 812.) There are no testing results in the record.

### B.      The ALJ's Decision

The Commissioner denied Plaintiff's application for benefits initially on August 5, 2020, and again on reconsideration on January 20, 2021. (AR 21.) Plaintiff requested a telephonic hearing before an Administrative Law Jaw (an "ALJ"), and the parties attended a telephonic hearing on September 8, 2021. (AR 21.) Plaintiff appeared by telephone with an attorney representative, and he testified with the assistance of a Spanish interpreter. (AR 21.)

In a decision dated September 17, 2021, the ALJ found that Plaintiff was not disabled as defined by the Act after conducting the five-step disability analysis set forth in 20 C.F.R. § 404.1520. (AR 23-31.) At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since February 4, 2020 (step one). (AR 23.) At step two, the ALJ found Plaintiff's borderline intellectual functioning to be severe. (AR 23). Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three). (AR 24-26.)

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[9] and applied the assessment at steps four and five. *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional

---

[9] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996). The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

capacity assessment at both step four and step five when we evaluate your claim at these steps."). The ALJ found Plaintiff's mental impairments from his BIF included the following symptoms: difficulty concentrating, reduced cognition and difficulty controlling his emotions. (AR 27.) In turn, the ALJ found these symptoms limited to the following RFC:

> to perform medium work as defined in 20 CFR 416.967(c) with the following additional limitations: the avoidance of workplace hazards and machinery; simple, routine 2-3 step tasks; simple decisions and instructions; occasional interactions with supervisors, co-workers, and the public; minimal to no changes to a routine work setting; no operation of motorized vehicles or equipment; and the claimant would be off task 5% of the workday.

(AR 26.) The ALJ found Plaintiff's mental status examinations, testing and the nature of his treatment did not support his allegations of disabling symptoms. (AR 26). In reaching the conclusion, the ALJ relied upon the opinion of the psychological consultative examiner ("CE"), Dr. Swanson. (AR 28.) At steps four and five, the ALJ found that Plaintiff had no past relevant work, but considering his age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (AR 30.) Those jobs included Cleaner II (Dictionary of Occupational Titles ("DOT") Number 919.687-014), Laundry Laborer (DOT Number 361.687-018) and Box Bender (DOT Number 641.687-010). Therefore, the ALJ concluded, Plaintiff was not disabled under the Social Security Act. (AR 30-32).

Plaintiff sought review of this decision before the Appeals Council, which denied review on July 22, 2022. (AR 1–8.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981. Plaintiff appealed the adverse determination and on July 22, 2022, the Appeals Council denied Plaintiff's request for review. (AR 1-8.)

### III.   LEGAL STANDARDS

**A.   Applicable Law**

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if [their] physical or mental impairment or impairments are of such severity that he is not only unable to do [their] previous work but cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing [their] past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue [their] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.     Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only]

when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence . . . is 'more than a mere scintilla,'" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Ford v. Saul*, 950 F.3d 1141, 1154 (9th Cir. 2020).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted). Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)).

Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.' " *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## IV.   DISCUSSION

Plaintiff contends, *inter alia*, that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to fully and fairly develop the medical record related to Plaintiff's BIF (including his gross fine motor skills).  For the reasons explained below, the Court finds that the ALJ erred by failing to fully develop the record, and that error was not harmless.  Because the Court will remand the matter on that basis, the Court will decline to address Plaintiff's remaining assertion of error.

### A.   Legal Standard

Claimants carry the burden to prove they are disabled.  20 C.F.R. § 404.1512(a).  However, "Social Security proceedings are inquisitorial rather than adversarial." *Schiaffino v. Saul*, 799 Fed. App'x 473, 476 (9th Cir. 2020) (quoting *Sims v. Apfel*, 530 U.S. 103, 111–12 (2000)).  An ALJ has a responsibility to develop a "complete medical history" and to "make every reasonable effort to help [the plaintiff] get medical reports."  20 C.F.R. § 404.1512(d).  "The ALJ always has a 'special duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003) (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)).

> The ALJ is not a mere umpire at such a proceeding . . . . it is incumbent upon the ALJ to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts. He must be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited.

*Id.* (quoting *Higbee v. Sullivan*, 975 F.2d 558, 561 (9th Cir. 1992)).  However, the duty to develop the record further is only triggered when there is ambiguous evidence or the record does not allow for proper evaluation of the evidence. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). The ALJ's duty to develop the record fully is heightened when a claimant is mentally ill and unable to protect his or her own interests.  *Id.*  An ALJ may discharge the duty by subpoenaing claimant's doctors, submitting questions to claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record. *Tonapetyan*, 242 F.3d at 1150.

**B.     Analysis**

The ALJ determined Plaintiff's BIF amounted to a severe medically determinable impairment and "that the claimant's medically determinable impairments could reasonably be expected to produce the above alleged symptoms reasonably related to those impairments." (AR 29.) However, Plaintiff argues the ALJ erred by failing to develop the record "given that no examining, treating or reviewing physician had reviewed the evidence and assessed any limitations resulting from 'weak' motor function," which is a recognized symptom of BIF. Doc. 19 at 18-19. Further, Plaintiff argues the ALJ should have ordered neuropsychological testing (including motor skills testing), as Plaintiff's family had previously sought this testing but struggled to have it completed.[10] Doc. 19 at 21.

Evidence in the record can largely be summed up as follows: (1) qualitative educational records, (2) IQ testing from Plaintiff's childhood, (3) IQ testing by CE Dr. Swanson, (3) language testing by CE Gomez and the (4) conclusions drawn by state agency physicians based on those documents. All the tests administered come to the same conclusion: Plaintiff has a low IQ. The remaining evidence provides various narratives (sometimes conflicting) on Plaintiff's abilities to function on a day-to-day basis.

This record, however, is ambiguous and inadequate to allow for proper evaluation of the evidence. The contours of Plaintiff's BIF are unclear. For instance, while Plaintiff has never been formally tested for intellectual disabilities, some of his IEP records *assume* an intellectual disability, noting "Progress toward grade level expectancies may be limited due to [Plaintiff's] intellectual disability." (AR 458 (2020 IEP), AR 495.) Neither has Plaintiff ever been tested for a learning disability despite well-documented academic struggles and his own concern he may have one. Dr. Michaels, who examined Plaintiff on July 28, 2021, suggested Plaintiff undergo neurocognitive testing to determine the extent of Plaintiff's BIF, as he reported symptoms consistent with intellectual disability. (AR 812.) Still, there is no follow-up medical evidence in the record.

---

[10] Plaintiff implies the delay in testing is related to its cost. *Id.*

The underdeveloped record is most apparent concerning Plaintiff's gross motor skills. Weak gross motor skills are a recognized symptom of learning disabilities associated with BIF. Doc. 19 at 18 (citing the National Institute of Health).  Plaintiff's weak gross motor skills are reflected throughout the record.  (AR 795 (January 2017 records noting Plaintiff struggles with typing, lacing, zipping and buttoning)); (AR 779 (January 2018 records noting Plaintiff struggles with typing, lacing, zipping and buttoning)); (AR 774 (December 2018 records indicating Plaintiff struggles to use kitchen tools because of his weak gross motor skills)); (AR 780 (December 2020 records noting Plaintiff struggles using kitchen utensils)).  Plaintiff's IEP records repeatedly note (albeit without normative commentary) that Plaintiff's fine/gross motor skills have never been formally tested (AR 412, 442, 479, 501) and there are no formal medical opinions related to Plaintiff's weak gross motor skills in the record.  The ALJ does not address Plaintiff's motor skills at all.  At best, the ALJ noted "[t]he claimant is learning daily living tasks with the assistance of his parents so he can become more independent with his basic living skills." (AR 30.)  The ALJ does, however, seem to acknowledge there may be more to Plaintiff's BIF.

> After considering the evidence that related to his health, the undersigned determined that the claimant *has ongoing issues that stem from his impairments*. However, the weight of the evidence does not suggest that he has additional limitations beyond those identified in the residual functional capacity statement . . . . Thus, regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings.

(AR 29 (emphasis added)).

Instead, the ALJ relied heavily on Plaintiff's participation in the transitional program at Fresno State, but even this evidence further demonstrates that the record lacks in medical opinion evidence.  For instance, the ALJ repeatedly highlighted the following from a 2019 IEP:

> [T]he claimant scored 98% on the Basic Reading Skills Test.  He was able to read each sentence with ease and fluency.  His only error was reading "pencil" instead of "pencils."  He was able to perform addition and subtractions problems with 100% accuracy without using a calculator.  He had difficulty with multiple digit multiplication, but was able to accurately complete 3/3 multiplication problems with at least one single digit number.

(AR 28 (citing AR 620-621)).  However, Plaintiff struggled in his more typical academic classes.  One year before the testing described above in the 2019 IEP, Plaintiff scored in the 4th percentile for reading comprehension, the 4th percentile for mathematics composite, and in the 1st percentile for total achievement in his high school evaluations. (AR 642.)  And while Plaintiff has maintained above a 3.0 GPA in his transitional program, it is unclear what the level of academic rigor is in these classes.  For instance, while participating in this program, Plaintiff takes classes such as Fitness Walking, Basketball Class and Horticulture Therapy.  (AR 471.)  The disparity between Plaintiff's achievement in his transitional program, presumably tailored for individuals like Plaintiff, and his achievement in high school further underscores the ambiguity of Plaintiff's learning abilities.

The Government asserts the record is adequate, as it contains approximately 820 pages of prior administrative medical findings, a consultative examination and Plaintiff's hearing testimony.  Doc. 22 at 18.   The record indeed contains these documents, but they entirely ignore (as does the Government) the lack of testing for learning or other intellectual disabilities, as well as any medical opinions on Plaintiff's gross motor skills and any related limitations.  And while there was IQ testing for the ALJ to consider, it is clear on this record that it alone is not sufficient for the ALJ to make a determination because there is evidence of potential learning or intellectual disabilities sufficient to trigger the ALJ's duty to develop the record further.  See, e.g., Thomas v. Berryhill, No. 2:16-CV-00148-LRS, 2017 WL 3758779 at *4 (E.D. Wash. Aug. 30, 2017) (finding a GED instructor's testimony of claimant's learning difficulties, along with claimant's testimony of the same, triggered the ALJ's duty to develop the record for learning disabilities).  The state of the record is at least ambiguous related to Plaintiff's conditions.  For these reasons, the ALJ committed legal error by failing to develop the record with respect to Plaintiff's potential learning

and intellectual disabilities as well as any limitations from his gross motor skills, especially considering some of these tests were being pursued at the time the ALJ wrote the decision.

The last issue is whether Plaintiff was harmed by the error. It is unlikely the ALJ's error was "inconsequential." Additional testing may have affected the ALJ's RFC, as well as the recommendations from the CEs and the testimony of the VE. Therefore, the error is not harmless.

### C.     Remand for Further Proceedings is Appropriate

Where the ALJ commits an error and that error is not harmless, the "ordinary . . . rule" is "to remand to the agency for additional investigation or explanation." *Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (citations omitted). The Ninth Circuit recognized a limited exception to this typical course where courts "remand[] for an award of benefits instead of further proceedings." *Id.* at 1100–01 (citations omitted); *see also id.* at 1100 (noting that this exception is "sometimes referred to as the 'credit-as-true' rule"). In determining whether to apply this exception to the "ordinary remand rule," the court must determine, in part, whether (1) "the record has been fully developed;" (2) "there are outstanding issues that must be resolved before a determination of disability can be made;" and (3) "further administrative proceedings would be useful." *Id.* at 1101 (citations omitted). As to the last inquiry, additional "[a]dministrative proceedings are generally useful where the record has not been fully developed, there is a need to resolve conflicts and ambiguities, or the presentation of further evidence . . . may well prove enlightening in light of the passage of time." *Id.* (citations omitted). Ultimately, "[t]he decision whether to remand a case for additional evidence or simply to award benefits is in [the court's] discretion." *Swenson*, 876 F.2d at 689 (citation omitted). Having found that the ALJ failed to fully develop the record, the Court finds that the "credit-as-true" exception to the "ordinary remand rule" is inapplicable because additional administrative proceedings are necessary. The Court will,

therefore, remand this matter for further proceedings.

### D. The Court Declines to Determine Plaintiff's Remaining Assertions of Error

As the Court finds that remand is appropriate for the ALJ to develop the record further, the Court need not address Plaintiff's other allegations of error (*see, e.g.*, Doc. 11 at 10–15, 19–21). *See Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we remand the case to the ALJ for the reasons stated, we decline to reach [plaintiff's] alternative ground for remand."); *see also Newton v. Colvin*, No. 2:13–cv–2458–GEB–EFB, 2015 WL 1136477, at *6 n.4 (E.D. Cal. Mar. 12, 2015) ("As the matter must be remanded for further consideration of the medical evidence, the court declines to address plaintiff's remaining arguments."); *Augustine ex rel. Ramirez v. Astrue*, 536 F. Supp. 2d 1147, 1153 n.7 (C.D. Cal. 2008) ("[The] Court need not address the other claims plaintiff raises, none of which would provide plaintiff with any further relief than granted, and all of which can be addressed on remand.").

### V. CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ committed legal error and therefore the decision is not supported by substantial evidence. Therefore, the ALJ's decision is VACATED and the case REMANDED to the ALJ for further proceedings consistent with this Order. The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Jaime Romero Bribiesca and against Defendant Kilolo Kijakazi, Acting Commissioner of Social Security.

IT IS SO ORDERED.

| Dated: | **November 15, 2023** | /s/ *Sheila K. Oberto* |
|---|---|---|
| | | UNITED STATES MAGISTRATE JUDGE |